**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Candra Evans, individually and as a parent to R.E., and Terrell Evans, individually and as a parent to R.E., | Case No.: 2:22-cv-02171-JAD-DJA |
| Plaintiffs | |
| v. | **Order Granting in Part Defendants' Motion to Dismiss** |
| Kelly Hawes, Joshua Hager, Scott Walker, Jesus Jara, and Clark County School District, | [ECF No. 36] |
| Defendants | |

Candra and Terrell Evans, on behalf of themselves and their minor daughter R.E., sue the Clark County School District (CCSD), former superintendent Jesus Jara, Principal Scott Walker, Assistant Principal Joshua Hager, and teacher Kelly Hawes for requiring R.E. to perform a monologue that contained explicit language in her theater class at the Las Vegas Academy of the Arts, a high school in Las Vegas, Nevada. When R.E.'s mom Candra discovered the assignment and voiced her concerns about its content at a public school-board meeting, the board stopped her from reading the monologue out loud. In their first-amended complaint, the plaintiffs allege that the defendants (1) violated Candra's free-speech rights under the United States and Nevada constitutions by keeping her from reading the explicit monologue at the public school-board meeting; (2) violated R.E.'s free-speech rights by compelling her to perform the monologue in class; (3) intentionally and negligently inflicted emotional distress by forcing R.E. to read the monologue; (4) acted negligently by assigning the monologue and failing to supervise or train Hawes "to teach in a manner consistent with school policies"; and (5) assaulted R.E. when Hawes "grabbed" R.E. during a conversation about the assignment. The defendants move to

dismiss, contending that plaintiffs fail to state any claim, the individual defendants are entitled to qualified immunity on the First Amendment claims and discretionary immunity on the state-law claims, and the claims against Jara should be dismissed as redundant of those against CCSD.

I dismiss Candra's First Amendment restrained-speech claim because the video of the school-board meeting—which is incorporated by reference in the complaint—disproves her characterization of the events, and the school board expressed reasonable, viewpoint-neutral restrictions on the use of profanity in public meetings. I dismiss the negligence claims because the plaintiffs do not sufficiently allege facts to show that this explicit-monologue scenario was foreseeable. And I dismiss the plaintiffs' claims for intentional and negligent infliction of emotional distress because these facts fall far short of the extreme or outrageous conduct or severe emotional distress required to state such a claim under Nevada law.

But I deny the motion to dismiss R.E.'s compelled-speech claims brought under the Nevada Constitution and the First Amendment because she sufficiently alleges that she was compelled to read an explicit monologue that lacked a legitimate pedagogical purpose. I find that Hawes is entitled to qualified immunity on R.E.'s First Amendment claim, so that claim moves forward against CCSD alone, but because qualified immunity applies to federal claims only, R.E.'s compelled-speech claim derived from the Nevada Constitution proceeds against both CCSD and Hawes. Finally, I permit R.E.'s assault-and-battery claim to proceed against Hawes because she has sufficiently alleged that Hawes "grabbed" and "held" her without her consent.

**Background[1]**

In March 2022, Las Vegas Academy (LVA) drama teacher Kelly Hawes required her students to write a monologue that would then be performed by a fellow classmate.[2]  Hawes reviewed, edited, and approved each monologue, then printed all of them and instructed her students to pick one at random from the pile.[3]  Hawes told the students that they could not select their own monologue and "could only exchange a selected monologue one time."[4]

R.E., the minor daughter of plaintiffs Terrance and Candra Evans, did not like the first monologue she picked, so she chose another.[5]  Her second pick was written from the perspective of "a girl coming out as a lesbian to her boyfriend."[6]  It contained sexually explicit language concerning the girl's interest in her female roommate and her disinterest in having sex with men.[7]  "Because R.E. had already used her one and only turn to exchange the first monologue she selected, R.E. believed she had no option but to study, memorize, and perform" the explicit monologue.[8]  The plaintiffs allege that R.E. knew Hawes had already edited and approved the monologue and that "her grade was conditioned upon her performing the monologue in front of

---

[1] These facts are taken from the plaintiffs' first-amended complaint (ECF No. 31) and are not intended as findings of fact.

[2] ECF No. 31 at ¶ 14.

[3] *Id.* at ¶¶ 15–16.

[4] *Id.* at ¶ 17.

[5] *Id.* at ¶ 18.

[6] *Id.* at ¶ 20.

[7] *See id.*

[8] *Id.* at ¶ 21.

the class."[9]  So R.E. performed the monologue, allegedly not understanding some of the sexually explicit content it contained.[10]

About a month later, Candra[11] discovered the written monologue and confronted her daughter about it.[12]  When she learned that it was a school assignment R.E. was required to perform, Candra hightailed it to her daughter's school and spoke to Assistant Principal Joshua Hager.[13]  He agreed that the monologue was inappropriate and told Candra that he wanted to meet with R.E. "to let her know that she could tell a teacher 'no'" if she felt uncomfortable with an assignment.  Candra agreed but requested that Hager not meet with R.E. alone and that a female administrator be present at that meeting.[14]  But Hager disregarded that request, and R.E. later reported to her parents that she was "scared and upset by [] Hager calling her into his office alone."[15]

For the next few weeks, Candra met with various LVA and CCSD administrators and employees about the monologue.  In one meeting, Hager and Hawes defended the assignment and told Candra that R.E. "could have said 'no,' but did not."[16]  In another meeting, Joseph Petrie, a school-associate superintendent, expressed that the monologue was inappropriate, that no administrator should have "made R.E. feel like she had any responsibility for having done the

---

[9] *Id.* at ¶¶ 23–24.

[10] *Id.* at ¶ 25.

[11] Because the plaintiffs share a last name, and to avoid confusion, I refer to Candra by her first name.  No disrespect is intended by doing so.

[12] *Id.* at ¶¶ 30–31.

[13] *Id.* at ¶ 32.

[14] *Id.* at ¶¶ 34, 38.

[15] *Id.* at ¶¶ 40–42.

[16] *Id.* at ¶¶ 44, 46, 50.

assignment," and promised to speak to LVA's principal Scott Walker to "investigate the matter further to determine what actions should be taken to ensure that it did not happen again."[17] Candra "again requested that no school administrators or teachers at LVA meet or speak with R.E. about the matter unless Candra was present," and Petrie "confirmed his understanding of this request and promised he would honor" it.[18]  Candra then tried to file a police report, but the officer at LVA "was dismissive of her concerns."[19]

On May 12, 2022, Candra brought her concerns to a CCSD school-board meeting.[20] During the public-comment period, Candra started reading the assignment out loud, but a member of the board stopped her from completing the reading because it contained profane language.[21]  The plaintiffs allege that CCSD's then superintendent and school-board member Jesus Jara "cut off Candra's microphone to silence her" and "spoke over her[,] preventing her from speaking or using her remaining allotted time to make a public comment."[22]

The next day, R.E. told Candra that Walker "pulled R.E. out of class and met with her alone in an alley behind one of the school buildings," told her "that there was a 'shortage of teachers' at LVA and that he was hoping to provide teachers with 'proper training soon,'" and then he brought her to Hawes's classroom and left her alone with Hawes.[23]  Hawes told R.E. that she was sorry "R.E. felt that the assignment was inappropriate," but Hawes didn't apologize for

---

[17] *Id.* at ¶¶ 60, 64, 66.

[18] *Id.* at ¶ 68.

[19] *Id.* at ¶¶ 69–70.

[20] *Id.* at ¶ 75.

[21] *Id.* at ¶ 78.

[22] *Id.* at ¶ 80.

[23] *Id.* at ¶¶ 88–92.

assigning the monologue.[24]  R.E. began to cry, then Hawes "initiated contact with R.E. without permission"—later on in the complaint plaintiffs clarify that Hawes "grabbed and held" R.E.[25]

## Analysis

### A.  Claims that are not facially plausible are vulnerable to dismissal.

Federal Rule of Civil Procedure 8 requires every complaint to contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief."[26]  While Rule 8 does not require detailed factual allegations, the properly pled claim must contain enough facts to "state a claim to relief that is plausible on its face."[27]  This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; the facts alleged must raise the claim "above the speculative level."[28]  In other words, a complaint must make direct or inferential allegations about "all the material elements necessary to sustain recovery under *some* viable legal theory."[29]

District courts employ a two-step approach when evaluating a complaint's sufficiency on a Rule 12(b)(6) motion to dismiss.  The court must first accept as true all well-pled factual allegations in the complaint, recognizing that legal conclusions are not entitled to the assumption of truth.[30]  Mere recitals of a claim's elements, supported by only conclusory statements, are insufficient.[31]  The court must then consider whether the well-pled factual allegations state a

---

[24] *Id.* at ¶¶ 95–96.

[25] *Id.* at ¶¶ 100, 191.

[26] Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[27] *Twombly*, 550 U.S. at 570.

[28] *Iqbal*, 556 U.S. at 678.

[29] *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)) (emphasis in original).

[30] *Iqbal*, 556 U.S. at 678–79.

[31] *Id.*

plausible claim for relief.[32]  A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[33]  A claim that does not permit the court to infer more than the mere possibility of misconduct has "alleged—but not shown—that the pleader is entitled to relief," and it must be dismissed.[34]

**B.    CCSD's actions at the school-board meeting did not violate Candra's First Amendment rights.**

**1.    *First Amendment standards for speech at public school-board meetings***

Open school-board meetings are considered limited public fora.[35]  "When the [government] establishes a limited public forum, [it] is not required to and does not allow persons to engage in every type of speech."[36]  But any restrictions "must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purpose served by the forum.'"[37]  The Ninth Circuit "permit[s] restrictions to maintain decorum and order

---

[32] *Id.* at 679.

[33] *Id.*

[34] *Twombly*, 550 U.S. at 570.

[35] *See Madison Joint Sch. Dist. No. 8 v. Wisconsin Emp. Rel. Comm'n*, 429 U.S. 167, 174–76 (1976) (describing speech restrictions that a school board could place on its public meetings); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 & n.7 (1983) (using the school-board meeting discussed in *Madison* as an example of a limited public forum); *Leventhal v. Vista Unified Sch. Dist.*, 973 F. Supp. 951, 957 (S.D. Cal. 1997) (noting that, "[s]ince *Perry*, courts have regularly read *Madison* to have declared open school-board meetings to be limited public fora"); *see also Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010) (holding that a school-board meeting's comment session is a limited public forum); *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017) (holding that the public-comment portions of a school-board meeting "fall into the category of limited public fora").

[36] *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001).

[37] *Id.* at 106–107 (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

in a proceeding."[38]  And the court's "inquiry into the reasonableness of restrictions takes into account whether the restrictions imposed leave open alternative channels of communication."[39]

### 2.    Plaintiffs fail to state a free-speech claim based on Candra's silencing at the school-board meeting.

In their first claim the plaintiffs allege that the school district violated Candra's First Amendment and state constitutional rights at the public school-board meeting because the board muted her microphone when she attempted to read the monologue her daughter performed.  They allege that CCSD and Jara "prevent[ed] her from speaking or using her remaining allotted time to make a public comment and thus kept her from speaking out about" "LVA's school governance, policies, and procedures and Defendants' knowing and intentional exposure of students, including R.E., to sexually explicit and obscene material."[40]  They also claim that the defendants prevented Candra from speaking "by silencing her microphone and preventing her from addressing her concerns of egregious conduct by CCSD officials before the board."[41]

### a.    The video of the meeting is incorporated into the complaint.

I previously allowed this claim to go forward, finding that Candra's allegations that she was prevented from raising further concerns at the meeting and that she was prevented from "speaking in the time and place assigned by the district" were sufficient to state a claim.[42]  And I declined to consider the video recording of the meeting because the defendants only cited it in

---

[38] *Reza v. Pearce*, 806 F.3d 497, 504 (9th Cir. 2015) (citing *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271 (9th Cir. 1995).

[39] *Id.*

[40] ECF No. 31 at ¶¶ 80, 123 (cleaned up).

[41] *Id.* at ¶ 124 (cleaned up).

[42] ECF No. 30 at 25:6–13.

their reply.[43]   The defendants now argue in their motion to dismiss that I should consider the

video because its contents are incorporated by reference in the first-amended complaint and it

shows that, while Candra was prevented from reciting the monologue because it contained

profanity, she was allowed to voice her concerns for an equal amount of time allotted to all

speakers.   The plaintiffs do not oppose my consideration of the video, arguing instead that it does

not undermine the allegations in their complaint.[44]   Because the parties agree that the video can

be considered and because it is incorporated by reference in the complaint,[45] I consider the video,

available on CCSD's website, in my analysis of this claim.   Doing so changes my original

conclusion about the claim's plausibility.

> **b.**      ***The video shows that Candra suffered no unreasonable, viewpoint-based restriction on her speech at the school-board meeting.***

The video of the school-board meeting shows that Candra began speaking at 24:40.[46]   All

speakers at this meeting were given two minutes to give remarks.[47]   About 40 seconds into her

allotted time, Candra started to read the monologue.   After members of the audience began

audibly objecting to the language it contained, a member of the school board interrupted her,

pausing her allotted time at 1 minute and 19 seconds and explaining that "we are not using

---

[43] *Id.* at 24:17–24.

[44] ECF No. 38 at 4.

[45] *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (noting that the incorporation-by-reference doctrine extends to "situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint").

[46] *See* ECF No. 31-1 (manual filing of CD containing video).   The video is also available on CCSD's website at https://go.boarddocs.com/nv/ccsdlv/Board.nsf/Public.

[47] *Id.*

profanity."[48]  Candra and the board member discussed for a moment, and Candra commented, "if you don't want me to read it to you, what was it like for my 15-year-old daughter" to perform it in class.  During that comment—which took place while her two-minute timer was paused—her microphone was muted for approximately twenty seconds while Jara told Candra that the regional superintendent would be available to speak to her.  At 27:12, Candra's allotted time began running again and she finished her prepared statement at 28:33.  She didn't read the rest of the monologue and censored herself once when referring to the assignment, but she spoke for the entirety of her allotted two minutes.[49]  Candra stated that she believed the monologue was pornographic and violated sexual-misconduct laws directed toward minors, and she expressed her wish that teachers "understand the laws about sexual abuse."[50]  The video disproves Candra's allegation that she was prevented from "speaking or using her remaining allotted time to make a public comment."[51]  In truth, she was only prevented from reading the profanities contained in the monologue.

Plaintiffs admit as much in their response but argue that the school board's censorship of the monologue itself chilled her speech because "[f]rom Candra's viewpoint, reading every word of the monologue, especially the offending words, was the only meaningful way to convey her message . . . ."[52]  They also contend that CCSD has not shown that it has any policies prohibiting profane speech that would allow the board to restrict Candra's speech in a viewpoint-neutral manner.  They cite to Nevada's Open Meeting Law, which allows reasonable time, place, and

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] ECF No. 31 at ¶ 80.

[52] ECF No. 38 at 7.

1  manner restrictions on speech but requires that those restrictions be included on the meeting

2  agenda.[53]

3        In response, CCSD produces such a policy.  Governance Policy GP-11, available on the

4  website where meeting agendas are posted, counsels that speakers "may not use racial slurs,

5  personal insults, threats, or other inappropriate language during their public comment period,"

6  and defines disruptive conduct that may warrant removal from the meeting as "yelling, stomping

7  of feet, whistles, applause, heckling, name calling, use of profanity, personal attacks, physical

8  intimidation, threatening use of physical force, assault, batter[y], or any other acts intended to

9  impede the meeting or infringe on the rights of staff or meeting participants."[54]  The policy gives

10  the board president the authority to "call a speaker to order if their statement exceeds their time

11  limit, is abusive, inappropriate, obscene, or disrupts the business of the board."[55]

12        As the video recording shows, Candra was prevented from reading the profanities

13  contained in the monologue.  But she was given an alternative method of communicating her

14  concerns: all she had to do was not use profane language, and she indeed used her allotted time

15  to object to the monologue using language appropriate to the forum.  Candra completed her

16  remarks without further interruption and conveyed that she believed the monologue was

17  pornographic and inappropriate.  The board's restriction on profane speech did not silence any

18  viewpoint Candra wished to convey, and the video recording of the meeting clearly shows that

19  Candra was able to fully express her concerns about the assignment to the board.  So I find that

20  Candra cannot prevail on this claim because she has not alleged a viewpoint-based, unreasonable

21

22

---

[53] *See* Nev. Rev. Stat. § 241.020(3)(d)(7).

23  [54] ECF No. 39-1 at 4–5; *also available at* https://ccsd.net/trustees/governance/.

[55] *Id.* at 5 (cleaned up).

restriction on her speech.  And because Jesus Jara is named as a defendant for these claims only, I also dismiss him from this action.

**C.     R.E. states a plausible claim for the violation of her First Amendment right against compelled speech.**

The plaintiffs' second claim alleges that defendants CCSD and Hawes violated R.E.'s First Amendment right not to engage in compelled speech.  Defendants contend that this claim fails because (1) R.E. didn't sufficiently allege that she was in fact compelled to recite the monologue, and (2) schools have the power to require students to complete assignments so long as the requirement serves a legitimate pedagogical purpose.

*1.     Plaintiffs have sufficiently alleged that R.E. was compelled to speak.*

In the complaint, R.E. alleges that Hawes gave students only one opportunity to exchange the monologue they selected if they did not want to perform their first choice.[56]  R.E. picked a monologue, decided she did not want to perform it, and then drew her second—and, as she believed, final—monologue.[57]  Because she had used her "one and only turn to exchange the first monologue she selected, R.E. believed she had no option but to study, memorize[,] and perform the second" profane one.[58]  R.E. also knew that Hawes had reviewed and edited the monologues and thus assumed that she approved of their contents.[59]  R.E. was also aware that "her grade was conditioned upon her performing the monologue in front of the class and she did not want a reduction in her grade."[60]

---

[56] ECF No. 31 at ¶ 17.

[57] *Id.* at ¶ 18.

[58] *Id.* at ¶ 21.

[59] *Id.* at ¶ 23.

[60] *Id.* at ¶ 24.

The Ninth Circuit has not identified the level of coercion that needs to be in place for a student to raise a compelled-speech claim. But other circuits have interpreted Supreme Court precedent to suggest that "a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion."[61]  In *Axson-Flynn v. Johnson*, a case in which a university student was required to perform monologues containing profane words to which she objected, the Tenth Circuit noted that a showing of compulsion was required but that it "need not take the form of a direct threat or a gun to the head"; "the consequence may be an indirect discouragement rather than a direct punishment . . . ."[62]

Assuming the Ninth Circuit would adopt an actual-compulsion requirement similar to the Tenth Circuit's, R.E. has sufficiently alleged that she felt compelled to perform the monologue or risk receiving a failing grade. The assignment was required, Hawes placed restrictions on R.E.'s ability to exchange the monologue a second time, and R.E. was aware that Hawes knew the contents of the monologue and thus approved of its performance. The defendants have not pointed to any authority suggesting that R.E. was obligated to object before she performed the assignment in order to preserve her First Amendment claim. R.E. alleges that she felt pressured by Hawes to complete the assignment and that the rules Hawes set for the assignment didn't give her the option to select a less objectionable monologue.[63]  At this stage, that's enough.

---

[61] *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005); *Phelan v. Laramie Cnty. Comm. College Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) ("In order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972))).

[62] *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (cleaned up).

[63] ECF No. 31 at ¶¶ 17, 21, 138.

### 2. R.E.'s compelled-speech claim is governed by *Hazelwood School District v. Kuhlmeier*.[64]

The First Amendment protects the speech of students in a public-school setting, but only to a point. While public-school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,"[65] those rights "are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment."[66] The Supreme Court has articulated three frameworks for analyzing student speech in schools.[67] Neither party in this case clearly articulates which framework should apply here,[68] so I begin by briefly discussing the legal landscape of school-speech cases to determine which standard should guide this analysis.

The first of these seminal cases, *Tinker v. Des Moines Independent Community School District*, involved the free-speech rights of students who wore black armbands at school to protest the Vietnam war.[69] The school demanded that the students remove the armbands and,

---

[64] *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988).

[65] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

[66] *Hazelwood*, 484 U.S. at 266.

[67] *See Pinard v. Clatskanie Sch. Dist.*, 467 F.3d 755, 765 (9th Cir. 2006) (breaking school-speech cases into three categories: "(1) vulgar, lewd, obscene[,] and plainly offensive speech" governed by *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986); "(2) school-sponsored speech" governed by *Hazelwood*, 484 U.S. 260, and "(3) speech that falls into neither of those categories" governed by *Tinker*, 393 U.S. 503 (citing *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 527 (9th Cir. 1992))).

[68] *See* ECF No. 36 at 7–12 (citing various circuit-court opinions concerning speech as part of a school's curriculum, but failing to clearly articulate any controlling applicable standard); ECF No. 38 at 8–14 (relying on a smattering of cases involving school uniforms, state license plates, and vulgar student speech made in school but not part of a curriculum, but failing to clearly articulate any controlling applicable standard).

[69] *Tinker*, 393 U.S. at 504.

14

1   when they refused, suspended them.[70]  The Supreme Court held that the students' "silent,

2   passive" protest was "akin to pure speech" that must be afforded complete First Amendment

3   protection.[71]  *Tinker* gave us the rule that schools cannot curtail speech without showing facts

4   that "might reasonably have led school authorities to forecast substantial disruption of or

5   material interference with school activities."[72]

6        In *Bethel School District No. 403 v. Fraser*, a student was suspended for delivering a

7   speech that contained "elaborate, graphic, and explicit sexual" language at a school assembly.[73]

8   The Supreme Court distinguished this situation from *Tinker*, largely because of the vulgar

9   content of Fraser's speech.  It held that schools have the right to limit speech and conduct that is

10  "wholly inconsistent with the 'fundamental values' of public-school education."[74]  Courts

11  interpreting *Fraser* have recognized that a school has broad authority to restrict lewd, vulgar, or

12  obscene speech made in a school setting.[75]

13       Finally, in *Hazelwood School District v. Kuhlmeier*, the Supreme Court considered a

14  school's decision to withhold certain student-written articles from the school's newspaper, which

15  was created by a journalism class as part of the school's curriculum.[76]  The Court reasoned that

16

_____

17  [70] *Id.*

    [71] *Id.* at 508.

18  [72] *Id.* at 514.

19  [73] *Fraser*, 478 U.S. at 678.

20  [74] *Id.* at 685–86 (cleaned up).

    [75] *See Mahanoy v. Area Sch. Dist. v. B.L. by and through Levy*, 141 S. Ct. 2038, 2047 (2021)
21  (distinguishing lewd speech from a student on social media directed at the school community,
    explaining that *Fraser* applies to speech given in a school setting); *Chen through Chen v. Albany*
22  *Unified Sch. Dist.*, 56 F.4th 708, 717 (9th Cir. 2022) (noting that "the First Amendment would
    not prevent a school from punishing" deeply offensive, racist speech that a student posted on
23  Snapchat "had it occurred under the school's supervision," citing *Fraser*).

    [76] *Hazelwood*, 484 U.S. at 262–63.

schools should have the latitude to control school-sponsored expressive activities because they might be "reasonably perceive[d] to bear the imprimatur of the school," and it emphasized that the strict *Tinker* standard should not be "the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression."[77]   The High Court held that schools can exercise authority over the content of "student speech in school-sponsored activities so long as their actions are reasonably related to legitimate pedagogical concerns."[78]   In *Brown v. Li*, the Ninth Circuit extended this *Hazelwood* rule to a school's restriction of speech in a university student's thesis, finding that "an educator can, consistent with the First Amendment, require that a student comply with the terms of an academic assignment," even if the assignment requires the student to discuss a "viewpoint with which the student disagrees, so long as the requirement serves a legitimate pedagogical purpose."[79]

R.E.'s case doesn't fit neatly into any of these rubrics because it involves speech that could be characterized as lewd or vulgar under *Fraser*, but it was assigned by a teacher, ostensibly as part of the school curriculum, invoking *Hazelwood*.[80]   The Ninth Circuit has not had the occasion to determine which standard should apply to inappropriate speech that is compelled as part of a student's curriculum.   I find persuasive the Tenth Circuit's opinion in

---

[77] *Id.* at 271–72.

[78] *Id.* at 273.

[79] *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002).

[80] To add an additional wrinkle, *Hazelwood* and *Li* dealt with a school *restricting* a student's speech, not *compelling* it.   But "in the context of protected speech, the difference" between compelled speech and compelled silence "is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."   *Riley v. Nat'l Fed. of the Blind of North Carolina, Inc.*, 487 U.S. 781, 797 (1988).   So I do not focus on this distinction, as the analysis should remain largely the same.

16

*Axson-Flynn v. Johnson*,[81] which grappled with this issue and reasoned that *Hazelwood* provides the best-fitting framework for this scenario.  In *Axson-Flynn*, and much like this case, a university theater program compelled a student to perform monologues containing language that the student objected to on religious grounds.[82]  The panel determined that the monologue didn't fall under *Tinker*, as that case addressed "pure student expression that a school must tolerate unless" it leads to a disruption of school activities, but Axson-Flynn's compelled speech "occurred in the classroom setting in the context of a class exercise and did not simply happen to occur on the school premises."[83]

Because the monologue assignments were part of the theater program's curriculum, the *Axson-Flynn* court applied *Hazelwood* and found that the school could proscribe or compel that speech if it had a legitimate pedagogical purpose to do so.[84]  The court ultimately concluded that "the school sponsored the use of plays with [] offending language in them as part of its instructional technique" to prepare "students for careers in professional acting" and refused to second-guess the "pedagogical wisdom" of that goal.[85]  I follow the Tenth Circuit's well-reasoned lead and apply the *Hazelwood* standard to R.E.'s compelled-speech claim.[86]

---

[81] *Axson-Flynn*, 356 F.3d at 1285–86.

[82] *Id.*

[83] *Id.* at 1291–92.

[84] *Id.* at 1289–90.

[85] *Id.*

[86] I recognize that the *Axson-Flynn* court did not address *Fraser* in its analysis and that the pedagogical legitimacy of explicit monologues assigned in a university setting may not translate to compelling the performance of explicit monologues in a high-school classroom.  But *Fraser* was concerned with unsanctioned student speech containing lewd language and focuses on the necessity of a school's ability to impose discipline "for a wide range of unanticipated conduct disruptive of the educational process." *Fraser*, 478 U.S. at 686.  So it does not provide helpful guidance when analyzing R.E.'s case, in which the school sanctioned a student's explicit speech and allegedly threatened punishment if R.E. *didn't* comply.  However, because this case involves

1
2

    ***a. R.E. has sufficiently alleged that she was compelled to express viewpoints she did not agree with.***

3    The defendants suggest that R.E. can't state a compelled-speech claim because Hawes

4 did not require her to adopt any viewpoint, express a particular belief, or agree with the contents

5 of the monologue.[87]  They rely on the Fourth Circuit's ruling in *Wood v. Arnold*,[88] which

6 assessed the propriety of a student assignment discussing the Muslim faith.  In *Wood*, a student

7 was required to fill in blanks to complete the *shahada*, an Islam declaration of faith.  The student

8 claimed that the assignment impermissibly compelled speech, but the court disagreed, reasoning

9 that the assignment "did not require Wood to profess or accept the tenets of Islam" and the

10 students "were not asked to recite the *shahada*, nor were they required to engage in any

11 devotional practice related to Islam."[89]  Rather the assignment "required Wood to write only two

12 words of the *shahada* as an academic exercise to demonstrate her understanding of the world-

13 history curriculum."[90]

14    I find defendants' reliance on *Wood* unpersuasive here because it is too factually

15 distinguishable.  R.E. was required to memorize and perform a monologue that expressed a

16 viewpoint about sexuality that she allegedly did not completely understand or agree with.  While

17 this assignment was in the context of a drama class, where it might be valid to require students to

18

---

19 students of approximately the same age as those in *Fraser*, and given *Fraser*'s focus on the
importance of shielding young minds from perverse speech, I keep in mind *Fraser*'s sentiment
20 that "[a] high school assembly or classroom is no place for a sexually explicit monologue
directed towards an unsuspecting audience of teenage students," *id.* at 685, while analyzing
21 R.E.'s claim.

[87] ECF No. 36 at 8.
22
[88] *Wood v. Arnold*, 915 F.3d 308 (4th Cir. 2019).

23 [89] *Id.* at 319.

[90] *Id.* (cleaned up).

perform works that they disagree with, this case is largely distinguishable from *Wood*, in which no belief whatsoever was expressed by the assignment.  And even if R.E.'s compelled speech did not contain objectionable ideological content, the First Amendment protects a person's right not to speak regardless of the message.[91]  At this stage I find that plaintiffs have sufficiently alleged that R.E. was compelled to speak in a manner that she otherwise wouldn't, on a topic that she did not agree with, so the assignment needed a legitimate pedagogical purpose.

### b.   The plaintiffs have adequately alleged that the assignment served no legitimate pedagogical purpose.

Plaintiffs allege that the profanity-laden monologue not only did not advance any academic purpose but "flies in the face of that compelling government interest."[92]  They cite to CCSD's policy prohibiting "verbal abuse of a student by an employee," which is defined to include "the use of any form of profanity in the classroom," and to the student code of conduct, which prohibits "content that is profane and/or of an obscene nature," to suggest that CCSD has no pedagogical leg to stand on.[93]  While those policies do not directly foreclose the use of profanity in assignments that may serve an academic purpose—for example, having students read a literary classic that contains swear words or sexual themes in order to broaden their perspectives—plaintiffs sufficiently allege that requiring this particular assignment did not fulfill a legitimate educational purpose within the context that it was placed: a high school classroom.

---

[91] *See Axson-Flynn*, 356 F.3d at 1283 n. 4 (citing *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001), for the proposition that the harm of compelled speech "occurs regardless of whether the speech is ideological").

[92] ECF No. 31 at ¶ 135.

[93] *Id.* at ¶¶ 9–10.  Plaintiff also cites Nevada laws about sexual-education curriculum.  As I stated in my oral ruling dismissing plaintiffs' original complaint, those laws are not relevant to this case as Hawes was not teaching "material relating to the human reproductive system and sexual responsibility" in the manner restricted by those laws.  *Id.* at ¶¶ 11–12.

Courts considering whether school-compelled speech serves a legitimate educational purpose have recognized that it depends on the age and maturity of the students involved and their ability to "learn the lessons the [assignment] is designed to teach."[94]  CCSD also does not provide the contours of the purported educational purpose that this assignment was meant to fulfill.  It instead relies on general statements of law, made in cases dissimilar from this one, cautioning judicial restraint when courts are asked to interfere with a school's curriculum.[95]  But the defendants do not point to any case that holds that courts must simply take schools at their word that every assignment fulfills a legitimate purpose merely because it was on the curriculum, particularly in a situation like this one, in which the type of language contained in that curriculum is similar to language which the Supreme Court has held is a school's prerogative to proscribe.[96]  And plaintiffs have alleged that at least two CCSD administrators agreed that the

---

[94] *Hazelwood*, 484 U.S. at 271; *see also Axson-Flynn*, 356 F.3d at 1289–20 (holding that "[a]ge, maturity, and sophistication level of the students will be factored in determining whether the restriction is reasonably related to legitimate pedagogical concerns"); *Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993) (holding that determining legitimate pedagogical concerns "will depend on, among other things, the age and sophistication of the students, the relationship between the teaching method and valid educational directive, and the context and manner of the presentation").

[95] ECF No. 36 at 8 (citing *Brown*, 308 F.3d at 953 (finding that a graduate student whose thesis contained a noncompliant "acknowledgements" section could not state a First Amendment claim because his university had a legitimate pedagogical purpose in ensuring that its graduates can conform to standards required in professional academic writing), *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 242–43 (2000) (concerning a university's fees charged to extracurricular student groups that expressed viewpoints with which some students might disagree), and *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1028 (9th Cir. 1998) (finding that schools may assign literary works containing profane words and racially unacceptable slurs without violating the Fourteenth Amendment or Title VI—the plaintiffs didn't bring a First Amendment claim)).

[96] *See Fraser*, 478 U.S. at 683–85; *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 988 (9th Cir. 2001) (acknowledging the deferential standard applied to school-sponsored speech but explaining that "deference does not mean abdication; there are situations [in which] school officials overstep their bounds and violate the Constitution").

assignment was inappropriate and may not have complied with school policy, calling into question whether CCSD officials believed that this monologue was academically proper and thus whether it served a legitimate pedagogical purpose.[97]  So, at this early stage in the proceedings, I allow R.E.'s First Amendment claim to proceed against CCSD.

### 3.  *Hawes is entitled to qualified immunity on R.E.'s First Amendment claim.*

#### a.  *Plaintiffs must show that Hawes violated a particularized and clearly established right to defeat Hawes's qualified-immunity defense.*

But R.E.'s First Amendment claim can't proceed against Hawes because the absence of clearly established law governing her conduct entitles her to qualified immunity.  The doctrine protects government officials "from money damages unless a plaintiff pleads facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct."[98]  The plaintiff bears the burden of showing that the right at issue was clearly established and "clearly prohibit[ed] the [municipal actor's] conduct in the particular circumstances before [her]."[99]  And although the plaintiff need not identify a case "directly on point, existing precedent must have placed the statutory or constitutional question beyond debate."[100]

The United States Supreme Court has warned lower courts to avoid addressing qualified immunity at a high level of generality[101] and has repeatedly emphasized that factual specificity is

---

[97] *See* ECF No. 31 at ¶¶ 34–35, 61–64.

[98] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[99] *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

[100] *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

[101] *Saucier v. Katz*, 533 U.S. 193, 201 (2001); *see also Sheehan v. Cty. of San Francisco*, 135 S. Ct. 1765, 1775–76 (2015); *Kisella v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018).

required when determining whether a right is clearly established.[102]  A prime example of just how granular a right must be for qualified-immunity purposes is *Mullenix v. Luna*.[103]  In *Mullenix*, the Fifth Circuit rejected an officer's qualified-immunity defense because it found he had "violated the clearly established rule that a police officer may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others.'"[104]  But the Supreme Court found that articulated right too general to provide fair notice of the proscribed conduct to officers faced with a fleeing felon.  The High Court honed in on the specific facts facing the officer: he "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering" another officer.[105]  It then went through several Supreme Court cases addressing the use of deadly force involving car chases and pointed out their myriad factual distinctions in those cases—whether other vehicles or civilians were in the way of the chase, just how recklessly the fleeing suspect was driving, the content of the suspect's threats—to show that "none of [the Court's] precedents squarely govern[ed] the facts" faced by the officer in *Mullenix*, so it could not be said that the specific right he violated

---

[102] *See, e.g.*, *Ashcroft*, 563 U.S. at 742 (noting that "[t]he general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established"); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (rejecting appellate court's definition of a clearly established right "to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances" as not particularized enough to support the denial of qualified immunity); *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

[103] *Mullenix*, 577 U.S. 7.

[104] *Id.* at 12 (citation omitted).

[105] *Id.* at 13.

was clearly established.[106]  The takeaway from the Supreme Court's recent qualified-immunity jurisprudence is that a court's analysis of the clearly-established-law prong "must be undertaken in light of the specific context of the case, not as a broad general proposition."[107]

### b.     Plaintiffs have not met their burden to show that Hawes's actions violated a clearly established right.

Plaintiffs argue that "there is no unsettled question of law here" by defining the clearly established law broadly and citing the Ninth Circuit's ruling in *Frudden v. Pilling* that "students maintain their First Amendment rights in the classroom and that a student can't even be required to wear a seemingly harmless motto on their uniform."[108]  Perhaps recognizing that a more narrow focus is needed, they also argue, without citation to federal case law or authority whatsoever, that "minor students cannot and should not be exposed to sexually explicit content in the classroom unless it is part of an approved curriculum chosen by elected officials and parents have their consent."[109]

Plaintiffs' efforts fall short of demonstrating that Hawes's conduct violated a clearly established right.  *Frudden* did not put Hawes on notice that assigning a monologue containing explicit language would run afoul of the First Amendment.  In that case, a public school adopted a policy requiring students to wear uniforms that had the school's motto "Tomorrow's Leaders" printed on the shirts.[110]  The Ninth Circuit held that compelling speech by requiring the students

---

[106] *Id.* at 14–15 (citing *Brosseau*, 542 U.S. at 197; *Scott v. Harris*, 550 U.S. 372 (2007); *Plumhoff v. Rickard*, 572 U.S. 765 (2014)).

[107] *Id.* at 12 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

[108] ECF No. 38 at 21 (citing *Frudden v. Pilling*, 742 F.3d 1199 (9th Cir. 2014)).

[109] *Id.*

[110] *Frudden*, 742 F.3d at 1201.

to wear the uniforms implicated the First Amendment.[111]  This case and *Frudden* are similar in that they both involve a school and the First Amendment.  But the similarities end there. *Frudden* concerned a school-wide policy requiring students to "be an instrument for displaying" the school's speech.[112]  This case involves an assignment requiring students to perform monologues written by their peers—one of which contained explicit language.  These factual distinctions alone foreclose relying on *Frudden* to find that the contours of R.E.'s free-speech rights in this case were clearly established.[113]  Plus, the legal analysis required in this case is wholly different from that in *Frudden*: the Ninth Circuit was not tasked with analyzing a school's curricular choices in a deferential manner under *Hazelwood*—which is what I (and Hawes) would be required to do here.  So *Frudden* does not supply the clearly established law to defeat Hawes's qualified-immunity defense.

Plaintiffs' assertion that "minor students cannot and should not be exposed to sexually explicit content in the classroom unless it is part of an approved curriculum chosen by elected officials and parents have their consent" gets closer to the factually detailed principle needed to

---

[111] *Id.* at 1203–06.

[112] *Id.* at 1205.

[113] *See, e.g.*, *Mullinex*, 577 U.S. at 12; *Evans v. Skolnik*, 997 F.3d 1060, 1067–69 (9th Cir. 2021) (granting qualified immunity to officer who screened and occasionally listened to portions of a prisoner's calls with a lawyer, finding that case law addressing officers who recorded the entirety of a prisoner's calls or read a prisoner's legal mail, or precedent on the attorney-client privilege generally, did not establish a specific clearly established right to be free from intermittent call monitoring); *Sampson v. Cnty. of Los Angeles by and through Los Angeles Cnty. Dep't of Children and Family Servs.*, 974 F.3d 1012, (9th Cir. 2020) (denying qualified immunity based on clearly established right that social workers who threaten to remove a child from an individual's custody can be liable for First Amendment retaliation, based on a directly on-point prior Ninth Circuit case in which the court "denied qualified immunity to a social worker because a reasonable official would have known that taking the serious step of threatening to terminate a parent's custody of his children, when the official would not have taken this step absent her retaliatory intent, violates the First Amendment" (citing *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019))).

show a clearly established right, but plaintiffs cite no authority for this rule.  Perhaps they are relying on the sections of the Nevada Revised Statutes that they cite in their complaint, which dictate the parameters of sex-education curricula in this state's schools.[114]  But qualified immunity doesn't concern itself with the violation of state laws—only with the violation of clearly established law found in the U.S. Constitution or federal law, and plaintiffs point to none.[115]  So, because plaintiffs have failed to identify any law that would have put Hawes on notice that these circumstances would violate a student's clearly established right, I grant Hawes qualified immunity from R.E.'s First Amendment-based compelled-speech claim.

### c.   Hawes's qualified-immunity defense is properly ripe for this motion-to-dismiss stage.

Plaintiffs insist that it's too early to talk about qualified immunity because the defense "must be resolved at summary judgment or at trial."[116]  This is a blatantly incorrect statement of law.  The case that plaintiffs cite for that proposition, *Morley v. Walker*, dealt with allegations about prosecutorial misstatements that, if true, would violate a clearly established right.[117]  But

---

[114] *See* ECF No. 31 at ¶¶ 11–12.

[115] *See Lovell by and through Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 371 (9th Cir. 1996) (noting that, "when a violation of state law causes the deprivation of a right protected by the United States Constitution, that violation may form the basis for a Section 1983 action," but clarifying that, "[t]o the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress"); *see also Davis v. Scherer*, 468 U.S. 183, 195–196 (1984) (rejecting suggestion that an official necessarily violates a clearly established constitutional right whenever he violates a statute or regulation).  The only state statutes and county policies that plaintiffs identify in their complaint concern regulations on sex-education curriculum.  *See* ECF No. 31 at ¶¶ 9–13.  Assuming that those laws have an impact in this case, plaintiffs still have not sufficiently alleged that some failure to follow those laws violates a student's First Amendment rights.

[116] ECF No. 38 at 20 (quoting *Morley v. Walker*, 175 F.3d 756, 761 (9th Cir. 1999)).

[117] *Morley*, 175 F.3d at 761.

because the parties disputed whether those misstatements were made, the court could not

determine whether qualified immunity applied until the facts were more developed in the

litigation.[118]  So *Morley* doesn't stand for the proposition that qualified immunity can't be

addressed at the motion-to-dismiss stage, but rather that disputed material facts about the conduct

itself can prevent the court from resolving the question.  The Ninth Circuit has repeatedly held

that the qualified-immunity defense is resolvable at the motion-to-dismiss stage if the court "can

determine, based on the complaint itself, that qualified immunity applies."[119]  And here, it can be

determined that qualified immunity applies because no controlling case comes close to

addressing the conduct alleged.

The net result of this analysis is that R.E.'s First Amendment claim remains against

CCSD only.  Although I'm skeptical that this claim can be pursued against a municipality under

§ 1983,[120] because CCSD does not raise any argument concerning county liability in its motion

to dismiss, it proceeds at this stage.[121]

---

[118] *Id.*

[119] *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) (quoting *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016); *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001); *Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004), *abrogated on other grounds as recognized by Pettibone v. Russell*, 59 F.4th 449, 452 (9th Cir. 2023) (noting that "government officials are entitled to raise a qualified[-]immunity defense immediately, on a motion to dismiss the complaint, to protect against burdens of discovery and other pretrial procedures" (citing *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996))).

[120] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (holding that "a municipality cannot be held liable under § 1983 on a respondeat superior theory"); *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (noting that "it is only when execution of a government's policy or custom inflicts the [constitutional] injury that the municipality as an entity is responsible").

[121] Because the deadline to move for dismissal has passed, if CCSD wishes to raise any further arguments about the propriety of this claim, it must do so in a summary-judgment motion.

**D.     R.E.'s liberty-of-speech claim under the Nevada Constitution proceeds against Hawes and CCSD, but Candra's state free-speech claim fails.**

The plaintiffs additionally couch their First Amendment theories as claims under Article 1, Section 9 of the Nevada Constitution.  That state-based, free-speech provision is "coextensive to, but no greater than, that of the First Amendment to the United States Constitution."[122]  Thus, the standard that applies to this claim "is identical to that under the First Amendment."[123]  Because I have determined that Candra's federal free-speech claim fails, her state claim fails too.  And because R.E.'s federal compelled-speech claim can go forward, her state claim can too.  But there is one critical difference: R.E.'s state claim proceeds against CCSD *and Hawes* because the qualified-immunity defense is created by the federal judiciary concerning federal law; it "is not a defense available to state actors sued for violations of the individual rights enumerated in Nevada's Constitution."[124]

**E.     Plaintiffs cannot state an intentional- or negligent-infliction-of-emotional-distress claim.**

To state an IIED or NIED claim under Nevada law, a plaintiff must allege that (1) the defendant engaged in "extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress," (2) the plaintiff "suffered severe or extreme emotional distress," and (3) "actual or proximate causation."[125]  To be extreme and outrageous, conduct must be "outside all possible bounds of decency" and regarded as "utterly intolerable in a

---

[122] *S.O.C., Inc. v. Mirage Casino-Hotel*, 23 P.3d 243, 251 (Nev. 2001).

[123] *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev. 2004).

[124] *Mack v. Williams*, 522 P.3d 434, 451 (Nev. 2022) (holding that "qualified immunity is not a defense to a private-damages action under Article 1, Section 18").

[125] *Star v. Rabello*, 625 P.2d 90, 91–92 (Nev. 1981).

civilized community."[126]  General physical or emotional discomfort is insufficient to demonstrate

severe emotional distress—a plaintiff must allege such "serious emotional distress" that it

"results in physical symptoms."[127]  As the Nevada Supreme Court has long held, "[t]he less

extreme the outrage, the more appropriate it is to require evidence of physical injury or illness

from the emotional distress."[128]  "A claim of negligent infliction of emotional distress requires

the plaintiff to show that the defendant acted negligently (i.e., breached a duty owed to plaintiff)

and 'either a physical impact . . . or, in the absence of physical impact, proof of serious

emotional distress causing physical injury or illness.'"[129]

I dismissed the plaintiffs' emotional-distress claim in the first motion-to-dismiss round,

explaining that the court is not necessarily concerned with "whether the content of the

monologue is extreme and outrageous but, rather, whether the teacher acted in some extreme and

outrageous manner by requiring that the student memorize and perform it."[130]  I found that the

allegations in the original complaint did not "support the inference that the teacher forced the

student to perform the monologue in a way that could be inferred as extreme and outrageous."[131]

I also found that the allegations that R.E. suffered emotional distress and has been seeing mental-

health professionals were insufficient to satisfy the severe-emotional-distress element.[132]

---

[126] *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (citation and internal quotations omitted).

[127] *Chowdhry v. NLVH Inc.*, 851 P.2d 459, 482 (Nev. 1993).

[128] *Id.* at 483 (quoting *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1145 (Nev. 1983)) (alteration in original).

[129] *Switzer v. Rivera*, 174 F. Supp. 2d 1097, 1109 (D. Nev. 2001) (quoting *Barmettler v. Reno Air. Inc.*, 956 P.2d 1382, 1387 (Nev. 1998)).

[130] ECF No. 30 at 31:22–32:1.

[131] *Id.* at 31:19–22.

[132] *Id.* at 32:3–11.

The IIED/NIED claim in the plaintiffs' amended complaint is not materially different from the one I dismissed.[133]  The plaintiffs again allege that requiring R.E. to read the monologue, when Hawes knew that it contained explicit language, was extreme and outrageous conduct that caused R.E. "extreme emotional distress."[134]  They aver that she has "received psychiatric medical treatment and has and continues to receive treatment from a therapist to address the harm she endured."[135]  For the same reasons I dismissed this claim the first time around, I dismiss it now.  These allegations do not sufficiently state that Hawes or CCSD acted extremely or outrageously by allowing a student-written assignment to be read in class, regardless of its contents.  While R.E. believed that she would be required to read the monologue, no allegations support the inference that Hawes forced her to read the monologue in any manner that could be perceived as intentional or fueled by a reckless disregard for R.E.'s emotional wellbeing.  Nor do the complaint's allegations of severe emotional distress meet the threshold required under Nevada law for either claim.  The plaintiffs do not provide any information about the effects of the "emotional distress" that they claim R.E. experienced besides reasserting that she's going to a therapist.  The fact that someone is seeing a mental-health professional doesn't establish the severity of the stress suffered; a plaintiff must describe this element in more detail than just vaguely repeating that she suffered emotional distress.[136]

---

[133] The plaintiffs primarily added legal statements and citations (which are not factual allegations) and allegations that Hawes knew that someone would have to read the explicit monologue because she edited and approved it.  These allegations don't change the calculus because they do not address whether having R.E. read the monologue was extreme or outrageous.

[134] ECF No. 31 at ¶¶ 154–155, 160.

[135] *Id.* at ¶ 160 (cleaned up).

[136] *See Chowdhry*, 851 P.2d at 483 (finding that "insomnia and general physical or emotional discomfort are insufficient to satisfy" the severe-emotional-distress requirement).

I have given the plaintiffs one opportunity to re-plead this cause of action, and they were unable to plead any additional facts to sufficiently state a claim, so it appears that any further amendment would be futile.  I thus dismiss plaintiffs' IIED and NIED claims with prejudice.

**F.    Plaintiffs fail to state a negligence claim against any defendant.**

"To prevail on a negligence theory, a plaintiff must generally show that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, (3) the breach was the legal cause of the plaintiff's injury, and (4) the plaintiff suffered damages."[137]  "[N]o duty is owed to control the dangerous conduct of another or to warn others of the dangerous conduct" unless a special relationship exists between the defendant and the victim and the harm created by the defendant's conduct is foreseeable.[138]  Indeed, "the foreseeability of harm is a predicate to establishing the element of duty."[139]  Under Nevada common law, the relationship between a teacher and her student is a special one.[140]

Plaintiffs theorize that CCSD, Hager, and Walker breached their duty of care to R.E. because they failed to "stay adequately informed of Hawes's curriculum and instruction of her class" and "ensure [that] she implemented her curriculum in accordance with school policy."[141]  Plaintiffs further allege that Principal Walker breached his duty to R.E. "when he had R.E. meet

---

[137] *Scialabba v. Brandise Const. Co.*, 921 P.2d 928, 930 (Nev. 1996) (cleaned up).

[138] *Sanchez ex rel. Sanchez v. Wal–Mart Stores, Inc.*, 221 P.3d 1276, 1280–81 (Nev. 2009); *see also Visnovits v. White Pine County School Dist.*, 2015 WL 1806299 at *4 (D. Nev. 2015) (applying the rule to a peer-on-peer attack at a middle school).

[139] *Dakis v. Scheffer*, 898 P.2d 116, 118 (Nev. 1995) (quotation omitted); *see also Taylor v. Silva*, 615 P.2d 970, 971 (Nev. 1980) ("A negligent defendant is responsible for all foreseeable consequences proximately caused by his or her negligent act.").

[140] *See Lee v. GNLV Corp.*, 22 P.3d 209, 212 (Nev. 2001) ("This court, however, has stated that where a special relationship exists between the parties, such as with a[] . . . teacher-student[,] . . . an affirmative duty to aid others in peril is imposed by law.").

[141] ECF No. 31 at ¶ 167 (cleaned up).

with Hawes completely alone, without R.E.'s parent or other school administrator present";

Hawes breached her duty "by allowing R.E. to receive the monologue and requiring R.E. to

memorize, read, and perform it as part of a graded assignment"; and CCSD "is liable via

respondeat superior for the acts of its employees."[142]

Plaintiffs' claim is devoid of any factual allegations suggesting that Hawes's decision to

have students perform their peers' written work, the explicit content that one of those

assignments contained, or the fact that R.E. would have to read it, were foreseeable to anyone at

CCSD. So nothing supports plaintiffs' claim against CCSD, Hager, or Walker for failing to

"exercise appropriate oversight" over Hawes's implementation of the school curriculum, as the

need for any additional oversight to prevent harm was not foreseeable. I thus dismiss that

portion of the claim.

Nor is there any fact from which I can infer that Hawes should have been aware that

performing the monologue would harm a student, as the plaintiffs have alleged that neither R.E.

nor her parents informed Hawes that the monologue made her uncomfortable before she

completed the assignment. They instead rely on sweeping statements of opinion about the

"pornographic" nature of the monologue to insinuate that anyone would realize that such content

would breach a teacher's duty of care. But simply knowing that an assignment has explicit

content—as do many famous works of literature, including those read daily by students in

classroom settings—does not show that R.E.'s distress was foreseeable, particularly when the

plaintiffs don't allege that R.E. or any other student made Hawes aware that the monologue

might cause them harm.

---

[142] *Id.* at ¶¶ 168–70.

The additional claim against Walker—that he shouldn't have left Hawes alone with R.E. after her parents made their concerns about the assignment known—is similarly lacking.  It cannot be reasonably inferred that Walker was or should have been aware that allowing R.E. to meet with Hawes would breach any duty that he owed.  The factual basis of this theory is that Walker knew that R.E.'s parents were upset that Hawes assigned an explicit monologue.  It is too great a logical leap to infer that anyone at the school would have been put on notice from that parental complaint that allowing R.E. to meet with Hawes would cause R.E. harm.  The plaintiffs also rely on the fact that R.E.'s parents told Assistant Principal Hager and school-associate superintendent Joseph Petrie that they did not want R.E. to speak with any teachers or administrators at LVA unless R.E.'s mom Candra was present.  But as I noted in my previous oral order dismissing plaintiffs' Fourteenth Amendment state-created-danger claim, plaintiffs "identify no law, ordinance, or school rule requiring school officials to comply with every parental request,"[143] and they still don't.  So I dismiss plaintiffs' negligence claim with prejudice because I've given them the opportunity to amend this claim once and it appears that further amendment would be futile.

## G.   R.E. doesn't state a claim for negligent training or supervision against CCSD.

Plaintiffs also assert a negligent training or supervision claim against CCSD, alleging upon information and belief that the district "should have known" that Principal Walker "had the propensity to improperly supervise" or train LVA's teachers, that Walker "should have known" that Hawes lacked "the training necessary to teach in a manner consistent with school policies," and that Hager, Walker, and CCSD should have prevented Hawes from assigning the

---

[143] ECF No. 30 at 27:13–16.

monologue.[144]  Plaintiffs also blame CCSD, Hager, and Walker for failing to take disciplinary or corrective action against Hawes or establish "protections" for R.E. following Candra's complaints.

To establish a claim for negligent training or supervision, "a plaintiff must show (1) a duty of care owed the plaintiff; (2) breach of that duty by" failing to train or supervise an employee "even though defendant knew or should have known of the employee's dangerous propensities; (3) the breach was the cause of plaintiff's injuries; and (4) damages."[145]

As was the case with plaintiffs' negligence claim, none of their allegations demonstrate that CCSD knew or should have known that Hawes would allow an explicit, student-written monologue to be performed by another student in her class and that such an assignment would make a student uncomfortable.  Absent any factual allegations showing that the defendants knew or should have known that this series of events would unfold, plaintiffs cannot state a negligent-training or negligent-supervision claim, so I dismiss this claim without leave to amend because amendment would be futile.[146]

**H.   R.E.'s assault-and-battery claim may proceed.**

Plaintiffs' final claim is one against Hawes for assault and battery.  In Nevada, "a battery is an intentional and offensive touching of a person who has not consented to the touching."[147]

---

[144] ECF No. 31 at ¶¶ 178–182.

[145] *Freeman Expositions, LLC v. Eighth Jud. Dist. Ct.*, 520 P.3d 803, 811 (Nev. 2022) (cleaned up).

[146] Because I've dismissed plaintiffs' negligence claims on their merits, I don't consider the defendants' discretionary-immunity defense.  And I don't consider the discretionary-immunity defense to plaintiffs' assault-and-battery claim because that defense doesn't apply to intentional torts.  *See Franchise Tax. Bd. of Cal. v. Hyatt*, 335 P.3d 125, 139 (Nev. 2014), *vacated on other grounds*, 578 U.S. 171 (2016).

[147] *Humboldt Gen. Hosp. v. Sixth Jud. Dist. Ct.*, 376 P.3d 167, 171 (2016) (cleaned up).

1  Nevada has not clarified the elements for a civil assault claim, but the Restatement (Second) of

2  Torts instructs that a plaintiff must show that the defendant: (1) intended "to cause a harmful or

3  offensive contact" and (2) the plaintiff was put in "imminent apprehension" of that contact.[148]

4      The plaintiffs allege that in a private meeting between Hawes and R.E., Hawes "made

5  intentional and unpermitted contact with R.E. by grabbing R.E. and holding R.E."[149]  Defendants

6  contend that this is still insufficient, arguing that "[t]here is no allegation of where R.E. was

7  purportedly grabbed nor is there any indication as to how long she was held and there is no[]

8  allegation that the purported grabbing was done with the intent to cause harm or offend R.E."[150]

9  Plaintiffs respond that "after verbally attacking R.E." about the assignment, "Hawes reached out

10  and grabbed and held R.E.  Hawes intended to cause this harmful and offensive contact.  R.E.

11  was both put in an apprehension of Hawes's harmful and offensive contact and Hawes did in fact

12  harmfully and offensively contact her."[151]

13      No doubt, this claim relies almost purely on barebone recitations of the elements of

14  battery and assault.  But it can be inferred from the closeness in time between Hawes's "verbal

15  attack" on R.E. and the "offensive contact" she allegedly caused that Hawes intended that her

16  contact was offensive.  And as notice pleading is all that is required, R.E.'s allegation that Hawes

17  grabbed and held her is sufficient at this stage.  So while R.E.'s assault-and-battery claim toes

18  the notice-pleading line set by FRCP 8, it will proceed against Hawes—and against CCSD

19  through a respondeat superior theory.

20

21

---

[148] Restatement (Second) of Torts § 21 (1965).

[149] ECF No. 31 at ¶ 191.

[150] ECF No. 36 at 19.

[151] ECF No. 38 at 19.

**Conclusion**

IT IS THEREFORE ORDERED that defendants' motion to dismiss **[ECF No. 36]** **is GRANTED in part:**

- Candra Evans's First Amendment and Nevada Constitutional claims with respect to her speech at a school-board meeting are DISMISSED with prejudice;

- Plaintiffs' claims for intentional and negligent infliction of emotional distress, negligence, and negligent training and supervision are DISMISSED with prejudice;

- R.E.'s First Amendment claim against Hawes is DISMISSED with prejudice on the basis of qualified immunity.

**The following claims proceed:**

- **R.E.'s First Amendment claim against CCSD;**

- **R.E.'s Nevada Constitutional claim concerning R.E.'s compelled speech against Hawes and CCSD;**

- **R.E.'s assault and battery claim against Hawes and CCSD.**

As no claims remain pending against Jesus Jara, Joshua Hager, and Scott Walker, **the Clerk of Court is directed to TERMINATE those defendants from this case**, and no claims on behalf of either parent individually remain.

_____
U.S. District Judge Jennifer A. Dorsey
February 26, 2024